**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CORTEZ HARDRICK**<br>1211 23d Street, NW<br>Washington, DC 20019<br><br>Plaintiff,<br><br>v.<br><br>**GOVERNMENT OF THE DISTRICT OF COLUMBIA**<br><br>Defendant. | Civil Action No.: **23-2151 (TJK)** |

**AMENDED COMPLAINT FOR MONEY DAMAGES, DECLARATORY AND
INJUNCTIVE RELIEF**

1.      Mr. Hardrick brings this civil rights action under 42 U.S.C. §§ 1983 and 1988 against the

government of the District of Columbia (sometimes the "District").

2.      This action challenges the constitutionality of the District's and the Chief's (through the

Firearms Registration Branch) seizure and pretextual retention of Mr. Hardwick's handgun

without providing him a retrieval procedure or notice how to invoke a prompt post deprivation

hearing, and the institution of baseless revocation proceedings against him to revoke his

registration certificate and his "CPL" (license to carry concealed a handgun in public) pursuant

to the Chief's policy of instituting revocation proceedings for negligent storage which he knows

he will dismiss while detaining the handgun.

3.      In addition to compensatory money damages and an order declaring any "arrest" referred

to in Firearms Registration Branch documents including emails and any "charges" referred to in

the Notice of Revocation of Firearm Registration (sometimes "Notice," discussed below) with

respect to Mr. Hardwick a legal nullity, Mr. Hardrick also seeks declaratory judgment, nominal damages, and attorneys' fees.

## JURISDICTION AND VENUE

4.      This Court has original "federal question" jurisdiction over the 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

5.      Venue is appropriate in this judicial District. Each of the claims for relief arose in this judicial District and all events described herein occurred in the District of Columbia.

## PARTIES

6.       The Plaintiff, Cortez Hardrick, is an approximately 30-year-old man who at the time of the incident owned a pistol for which he held a registration certificate issued by the Chief of the District of Columbia Metropolitan Police Department ("MPD") and a CPL issued by the Chief of the MPD (the "Chief").

7.      The District is a municipal corporation capable of being sued under D.C. Code § 1-102 and the District is a "person" under Section 1983.

## FACTUAL ALLEGATIONS
### Introduction

8.      The Plaintiff, Cortez Hardrick, was at the time of the incident an approximately 30-year-old African American man who is a long-time resident of the District.

9.      He owns his own real estate business.

10.     He specializes in matching up landlords with renters who are looking for Section 8 housing.

11.     He drives a Tesla automobile.

12.    On July 25, 2022, at about 1:25 p.m., Mr. Hardrick was driving his Tesla in Georgetown in the District when he was stopped on Bank Alley between M Street and Prospect Street, N.W. in Georgetown by the MPD based on a false complaint by occupants of another vehicle which MPD investigated as an ADW.

13.    A few days after the stop, on July 26, 2022, the MPD applied to the USAO for a warrant for ADW and negligent storage of a handgun around children. The USAO declined to issue a warrant because the MPD did not make out probable cause to support either offense.

14.    A few days after the stop, on July 26, 2022, MPD generated an activity report summary which states in pertinent part, "It was determined no ADW took place."

15.    MPD never re-submitted a warrant on either charge.

16.    Nonetheless the Firearms Registration Branch revoked Mr. Hardwick's registration certificate and CPL for about two months based a negligent storage charge the United States Attorney's Office had rejected for lack of probable cause, and the Chief retained Mr. Hardwick's handgun for a total of about ten months.

**MPD Stop Mr. Hardwick and Seize and Retain his Handgun**

17.    Right after stopping Mr. Hardwick, two officers of the MPD, a sergeant and a patrol officer, got out and asked Mr. Hardrick to get out of his vehicle and talk to them.

18.    Mr. Hardrick complied and got out of his vehicle.

19.    As soon as Mr. Hardrick got out of his Tesla the officers handcuffed his hands behind his back.

20.    The sergeant on the scene was always courteous and polite to Mr. Hardwick and Mr. Hardwick was always relaxed, courteous and cooperative.

21.    The sergeant "immediately" asked Mr. Hardrick whether he had a gun on his person or in his vehicle.

22.    Mr. Hardrick informed the MPD officers that he had a CPL and a registered firearm, and that the registered firearm was stored out of sight in a closed console in the cockpit of the Tesla under the Tesla screen.

23.    The compartment is like a console inside the glovebox. It has two different covers. Both were closed at the time, so the gun was hidden from view and securely stored.

24.    The sergeant reached into Mr. Hardrick's pants pocket and pulled out his wallet, opened it up, and pulled out the driver's license, the registration card, and the CPL (also a laminated card).

25.    Mr. Hardwick told the officers how to open the console.

26.    An officer eventually removed the gun from the console and recovered it as evidence.

27.    A "white shirt" (a lieutenant or other high-ranking MPD officer) arrived on the scene and he falsely told Mr. Hardrick that he was illegally storing/ carrying/transporting his firearm because he had it in the closed console rather than in a holster on his hip.

28.    The one-page public incident report narrative (a short version of the narrative for public use, not the complete internal police report) states in part, "The firearm was not in a holster nor on [Mr. Hardrick's] person, therefore, the firearm was negligently stored in the vehicle."

29.    The one page public incident report from the incident states that the offense code was D.C. Code @ 7-2507.02(B) (criminally negligent storage of a firearm) which governs keeping a firearm "on any premises under his control if he knows or reasonably should know that a minor

is likely to gain access to the firearm without the permission of the parent or guardian of the minor." D.C. Code @ 7-2507.02(B).

30.    The negligent storage statute has no relevance to Mr. Hardwick's carrying a licensed registered handgun while driving a car, because it relates to storage of a gun in a home or building when children are present.

31.    The Notice of Revocation of Firearm Registration also states that the registration was revoked because of negligent storage near minors although the Notice cites to D.C. Code @ 7-7-2502.02 which prohibits the registration of certain firearms such as sawed-off shotguns and machine guns.

32.    The white shirt physically returned Mr. Hardrick's registration certificate and CPL to him, but he orally told Mr. Hardrick that both were legally revoked as of that time and that he was no longer able legally to carry a gun in the District.

33.    The MPD arrest reports and the PD 81 (MPD property recovery form) list negligent storage as the evidentiary hold charge on the gun.

34.    But Mr. Hardrick did not violate any law or regulation regarding the way he was carrying the pistol.

**Chief's protocol for handling seizures of handguns for negligent storage charges**

35.    The white shirt, the sergeant, and another officer discussed amongst themselves how to handle Mr. Hardwick and his handgun.

36.    The sergeant told the white shirt that his understanding of the MPD policy for handling alleged negligent storage violations was to seize the handgun, apply for a warrant, forward the paperwork to the Firearms Registration Branch, and send the CPL holder on their way.

37.    The three men phoned Lt. Stephen Amodeo, who in June 2022, was assigned as a lieutenant to the Technical and Analytical Services Bureau's Records Division, overseeing the Firearms Registration Branch for confirmation of their understanding of the protocol.

38.    The Firearms Registration Branch is responsible for firearm registration and concealed carry licensing in Washington, D.C.

39.    Lt. Amodeo confirmed their understanding of MPD policy on how to handle alleged negligent storage violations.

**MPD seized Mr. Hardwick's gun and applied for a warrant, but within four days of the seizure the prosecutor declined to prosecute**

40.    Pursuant to the Chief's policy, the MPD seized Mr. Hardwick's gun, applied for warrant, forwarded the paperwork to Firearms Registration Branch, and released Mr. Hardwick without giving him a citation or notice to return to court.

41.    An MPD officer, Officer Mullen, prepared a report and applied for a warrant to the U.S. Attorney for negligent storage and ADW.

42.    The Assistant U.S. Attorney ("AUSA") to whom the District referred the charges for prosecution and for obtaining a warrant informed the District a few days after the stop of Mr. Hardrick by MPD that the U.S. Attorney's Office ("USAO") rejected the negligent storage charge because it applied to storage of a gun around children and no children were present.

43.    By email dated July 26, 2022 sent to Officer Mullen and Lt. Amodeo, the AUSA informed that that the USAO denied the negligent storage charge because one of the elements of the offense was that Mr. Hardrick "knew or should have known that a minor was likely to gain

access to the firearm without the permission" because of the storage, but the affidavit did not establish facts to support this element.

44.     The USAO denied the warrant for the ADW charge without comment.

45.     Thus, in Superior Court parlance, the USAO "no-papered" the negligent storage charge by denying the application for a warrant.

46.     "No-paper" is a term unique to this jurisdiction that means no Superior Court prosecution was ever initiated (or "papered") by complaint or information filed by the prosecutor. *See* D.C. SCRCrim. Rules 3 and 5.

47.     It simply means that the prosecutor has declined to file new charges based off the current arrest." Superior Court - Master Branch Standard Operating Procedures.

48.     The AUSA invited MPD through Officer Mullen to resubmit the warrant "[i]f you believe you have sufficient evidence for another USAO charge," but MPD did not submit another warrant application for any other charge.

**The Firearms Registration Branch revoked Mr. Hardwick's registration certificate and CPL based on the negligent storage charge the prosecutor had rejected for lack of probable cause**

49.     On August 22, 2022, Lt. Amodeo instructed his staff ~~Nina Latif~~ by email to revoke Mr. Hardwick's registration certificate because "gun registration shows he was arrested 7-25-2022 for CCN # [xxx], negligent storage."

50.     On August 25, 2022, the Firearms Registration Branch issued a "Notice of Revocation of Firearm Registration" of Mr. Hardwick's registration certificate which stated in the first line of text, "A determination has been made to revoke your "Firearms Registration Certificate."

51.     Reasons given for the revocation in the Notice were: (1) because, the Notice states, he criminally negligently stored his firearm pursuant D.C. Code § 7-2502.02 which prohibits the registration of certain firearms such as sawed-off shotguns and machine guns. Mr. Hardwick treated the appeal of the registration certificate as based on a violation of D.C. Code § 7-2507.02(B) because the text of the notice of revocation quoted from that section which governs storage of weapons in the home when small children are present; and

52.     (2) because, the Notice states, Mr. Hardwick was "charged" with "Criminally Negligent Storage of a Firearm" and his "firearm was taken by MPD officers and processed as evidence."

53.     The only agency that "charged" Mr. Hardwick was the MPD itself because although the MPD applied for a warrant from the United States Attorney's Office the USAO declined to issue a warrant because the "Criminally Negligent Storage of a Firearm" charge did not apply to Mr. Hardwick because no children were present.

54.     The MPD-generated activity report summary dated July 26, 2022, states in pertinent part, "It was determined no ADW took place."

55.     Therefore, the Firearms Registration Branch revoked Mr. Hardwick's registration certificate based on an MPD "charge" ("Criminally Negligent Storage of a Firearm") that the USAO had refused to prosecute because the facts alleged in support of the warrant application did not satisfy the elements of the offense and thus did not establish probable cause.

56.     The revocation of Mr. Hardwick's registration certificate became immediately effective because: (1) by "Notice of Revocation" dated August 25, 2022, the Firearms Registration Branch also revoked his CPL because a CPL holder must have a valid registration certificate for the handgun they intend to carry, and, according to the Firearms Registration Branch, Mr. Hardwick

no longer had the required registration certificate for the pistol he intended to carry in public; (2) the Concealed Pistol Licensing Review Board (the "Board"), the entity which at that time had jurisdiction to hear appeals from revocations of CPLs by the Chief, immediately dismissed his appeal from the revocation of Mr. Hardwick's CPL for lack of jurisdiction because of the revocation of his registration certificate while the appeal of the registration certificate by the Chief was still pending, before it (the appeal of the revocation of the registration certificate) was denied; and (3) dismissing the appeal of the CPL revocation rather than staying the appeal left Mr. Hardwick without a CPL because a revocation becomes effective when appeals end; (4) MPD staff told Mr. Hardwick that the MPD system for tracking registration certificates and CPLs showed Mr. Hardwick's CPL as revoked as of August 25, 2022 up through at least October 2022; and (5) the Review Board that handled appeals from revocations of CPLs at that time told Mr. Scrofano (Mr. Hardwick's lawyer) in October 2022 that the Firearms Registration Branch would issue him a new CPL but the Firearms Registration Branch  never issued Mr. Hardwick a new CPL at that time.[1]

57.     Mr. Hardwick's CPL was still listed in the MPD system that the MPD and other law informant use to track the status of registration certificates and CPLs as "revoked" until at least October 2022.

---

[1] The District has a two-tiered, registration certificate and licensing regime which operates as one organic system because the District makes possession of a registration certificate a prerequisite for obtaining and holding a CPL. D.C. Code § 7-2509.02 (includes as a prerequisite for obtaining a CPL possession of a registration certificate for the handgun the person wishes to carry).

58.     MPD and other law enforcement organizations operating in the District rely on data in the registration certificate/ CPL tracking system to ascertain whether a person holds a valid registration certificate or CPL issued by the Firearms Registration Branch.

59.     Had Mr. Hardwick been stopped by MPD after August 25, 2022, while carrying his handgun, he would have been subject to arrest for CPWL, carrying a pistol without a license, a felony. D.C. Code § 22-4504.

60.     The District has in the last few years settled at least one lawsuit brought by a CPL holder who was arrested on about March 29, 2024, for carrying on a revoked CPL while the CPL holder was appealing a notice of revocation because the MPD showed the CPL as revoked even though an appeal was pending.

61.     Immediately giving effect to revocations of CPLs when the Chief revokes a registration certificate without waiting for the resolution of the appeal of the registration certificate is standard operating practice for the Chief and the Board because the Chief routinely revokes CPLs as soon as a registration certificate is revoked by a "Notice of Revocation Firearm Registration" without waiting to see if the registrant appeals the revocation of the registration certificate. See D.C. Code § 7-2509.02.

62.     Mr. Hardrick had to retain a lawyer to deal with the revocation of his registration certificate and his CPL.

63.     Mr. Hardrick had to pay thousands of dollars of attorney's fees to restore his registration certificate and CPL and to assist in the recovery of his pistol.

**The MPD artificially prolonged the period during which it classified the handgun "as evidence"**

64. The MPD without justification prolonged the period during which it classified Mr. Hardwick's handgun "as evidence" by manipulating its own classification rules by not obtaining from the relevant prosecutor the MPD form (a "PD 81-C") which MPD's own rules require before releasing property held as evidence, or by not changing the classification when the USAO denied a warrant for lack of probable cause which would have allowed MPD to release the handgun without a PD 81-C.

65. Any argument that the retention of Mr. Hardwick's handgun seized by the MPD was because the property was classified as evidence, given that the responsibility for classifying and declassifying property as evidence lies with the MPD, is circular.

66. The MPD had no legal justification in retaining Mr. Hardwick's handgun "as evidence" after the USAO denied the warrant application for negligent storage and the MPD did not resubmit a warrant application or ask another prosecutor to charge a negligent storage offense or other offense.

67. The MPD -- not the relevant prosecutor -- classifies property coming into the custody of the Department as evidence and the other classifications pursuant to written policy statements setting policies for property coming into the custody of the Department promulgated by the Chief. General Order 601.1, Property coming into the Custody of the Department. https://go.mpdconline.com/GO/GO_601_01.pdf

68. Pursuant to policy statements promulgated by the Chief of the MPD, the MPD control the classification of property as evidence by checking the evidence box on the PD 81, an MPD form memorializing the seizure or receipt of property, and by entering the property as evidence on the Property Book.

69.    The MPD classifies all handguns seized or coming into the custody of the MPD as "evidence" pursuant to policy.

70.    The Chief's policy also provides that the MPD will not release property it has classified as evidence until it has received a PD 81-C form relating to the property from one of the District prosecutors indicating that the prosecutor does not object to the release of an item of property classified as evidence by the MPD even when the prosecutor has declined to prosecute the case.

71.    A PD 81-C is an MPD form which the MPD uses to obtain from the relevant prosecutor (U.S. Attorney or District of Columbia Attorney General) a statement that the prosecutor does not object to the release of an item of property classified as evidence by the MPD.

72.    The MPD controls how long an item of property is classified as evidence because the MPD control when to present the PD 81-C "no objection" form to the prosecutor for signature.

73.    Because the MPD seized Mr. Hardrick's gun without a warrant and without an arrest, General Order 601.1 delegates responsibility for obtaining the PD 81-C/ releasing property to the "investigator" (or the member first taking the property into custody when there is no investigator). *Id.* at p. 26, (¶ III, F, 4).

74.    But the General Order 601.1 does not impose any time limit on the investigator for obtaining a PD 81-C when the case is not papered, and the property is not seized incident to arrest. General Order 601.1, p. 26, III(F)(4).

75.    Because the MPD through the investigator controls the timing of when to submit the PD 81-C to the relevant prosecutor, the investigator controls when to release the property. *Id.* General Order 601.1 does not set a deadline or even offer any guidance to investigators for how long they may retain such property or for releasing the property.

76.     The Chief's written policy statement provides that when property is seized incident to arrest but the prosecutor "no-papers" the arrest the arresting officer is responsible for obtaining a PD 81-C from a prosecutor. General Order 601.1, p. 14, I(I)(9).

77.     Nothing in the Chief's written policy statements authorizes officers to shift to owners or other claimants of property the MPD's self-imposed obligation to obtain a PD 81-C from a prosecutor.

78.     Yet no MPD officer or investigator obtained a PD 81-C from a prosecutor after the USAO declined to prosecute the negligent storage charges against Mr. Hardwick.

79.     Instead, the MPD told Mr. Hardwick the only way for him to obtain the release of his handgun was to obtain the PD 81-C himself.

80.     The MPD have discretion to retain property and to retain the evidence classification even after a prosecutor has signed a PD 81-C "no objection" form.

81.     MPD have authority to change a classification from "evidence" to another classification such as "safekeeping" which allows MPD to release property by using its own internal re-classification procedure by filling out a PD 81-D after the prosecutor rejected the charge.

82.     MPD training materials posted online on the MPD website explain that MPD has a procedure for changing the classification of property when it becomes apparent that the original classification of property taken by MPD is no longer appropriate.

https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/3.4%20Property.pdf District of Columbia MPD Metropolitan Police Academy website

83.     Mr. Robert Sutton, the Manager of the Evidence Control Division, explained in a deposition on March 28, 2025, in the *Parrott v. Government of the District of Columbia* case,

that MPD can change the classification of property, including guns, from evidence to "safekeeping" when probable cause no longer exists which allows the MPD to return the property.[2]

**Mr. Hardwick attempts to regain possession of his handgun**

84.     During the first week of October 2022 (after receiving the new digital registration certificate for his handgun) Mr. Hardwick called the MPD Firearms Registration Branch to regain possession of his handgun because the MPD Firearms Registration Branch had issued him a new registration certificate.

85.     The MPD Firearms Registration Branch told him he needed to obtain a PD 81-C from the relevant prosecutor as a first step to recovering possession of his handgun.

86.     Mr. Robert Sutton, the Manager of the Evidence Control Division, explained in a deposition on March 28, 2025, in the *Parrott* case that the PD 81-C does not mean that the relevant prosecutor gives MPD *permission* to release property the MPD has classified as evidence.

87.     The MPD Firearms Registration Branch also told Mr. Hardwick that according to the official MPD tracking system for tracking registration certificates and CPLs, his CPL was showing as still revoked.

88.     The MPD Firearms Registration Branch told Mr. Hardwick to call the MPD District station where he was arrested for a PD 81-C.

---

[2] "That refers to money, guns. They're changing the property classification to safekeeping, and now we're free to release it." Sutton deposition.

89.    Mr. Hardwick obtained the name and email of the officer who recovered his handgun and on October 6, 2022, he emailed that officer, Officer Mullen, for a PD 81-C signed by the relevant prosecutor.

90.    Officer Mullen replied that he would talk to the property officer in his District.

91.    By email dated October 10, 2022, Officer Mullen replied and told Mr. Hardwick that the application for a warrant in his case had been denied without specifying when it had been denied.

92.    Ultimately on December 2, 2022, after much effort expended by Mr. Hardwick and his attorney, Mr. Scrofano, going back and forth between Officer Mullen and the "AUSA" (Assistant U.S. Attorney), the AUSA informed Mr. Scrofano by email that she had transmitted a signed PD 81-C to Officer Mullen indicating that the U.S. Attorney had no objection to the release of Mr. Hardwick's handgun.

93.    The AUSA cautioned Mr. Scrofano that her signing the PD 81-C did not trigger release of the handgun, that was still up to MPD.

94.    After the PD 81-C was transmitted to the Evidence Control Division, the division of the MPD that physically stores property coming into the custody of the MPD and that has custody of property classified as evidence, Mr. Hardwick contacted Ms. Carmella Dunmore, a staff member of the Evidence Control Division.

95.    Ms. Dunmore informed Mr. Hardwick by email dated December 13, 2022, that the Evidence Control Division had processed the PD 81-C.

96.    Ms. Dunmore told Mr. Hardwick that the next step in retrieving his handgun was to obtain a clearance from the MPD Firearms Registration Branch.

97.    Ms. Dunmore informed Mr. Hardwick that his primary contact person at MPD Firearms Registration Branch would be Ms. Renee Campbell.

98.    Mr. Hardwick spoke on the phone with Ms. Campbell, and she emailed him.

99.    Ms. Campbell told Mr. Hardwick by phone on about December 13, 2022, that the Chief had to issue the release for the release of his handgun, but that the Chief was not approving the release of any handguns held by the MPD at that time.

100.    The Chief did not authorize the release of Mr. Hardwick's handgun until about April 7, 2023.

101.    By email dated April 7, 2023, Ms. Campbell informed Mr. Hardwick that he could go to Evidence Control Division and pick up his handgun.

102.    Mr. Hardrick's CPL was still listed in the MPD CPL tracking system as "revoked" although the Review Board that handled appeals from revocations of CPLs at that time had told Mr. Scrofano in October 2022 that the MPD would issue him a new CPL (but it never had issued a new CPL).

103.    The Evidence Control Division gave Mr. Hardwick back his handgun and his registration certificate allowed him to transport the handgun to his home even without a CPL.

104.    Mr. Hardrick was without his registration certificate CPL for two months.

105.    But it took until April 7, 2023, almost ten months, before MPD notified Mr. Hardrick that he could retrieve his handgun from the Evidence Control Division of the MPD because – he was told -- the Chief had blocked the return of his handgun at that time pursuant to the Chief's policy of blocking the release of all firearms held by the MPD at that time.

106.   Based on documents provided by the District's counsel in this case on October 29, 2024, the MPD Firearms Registration Branch informed the "Review Board" (to whom Mr. Hardwick had appealed the revocation of his CPL) that the Chief had reversed the revocation of his registration certificate.

107.   The Board had already on September 19, 2022, dismissed Mr. Hardwick's appeal of the revocation of his CPL for lack of jurisdiction (based on the Chief's August 25, 2022, revocation of his registration certificate). Therefore, the revocation of Mr. Hardwick's CPL had become effective and final no later than when his appeal was over, on September 19, 2022.

108.   The MPD never re-issued Mr. Hardwick a new CPL, the CPL he held had become finally revoked no later than September 19, 2022, and the MPD system for tracking registration certificates and CPLs showed Mr. Hardwick's CPL as revoked as of August 25, 2022.

109.   His CPL was still listed in the MPD CPL tracking system as "revoked."

**The District's gun control statutes enacted by the D.C. Council give the Chief unfettered discretion to implement and to administer the District's gun control regime**

110.   The District's gun control regime consists of statutes enacted by the D.C. Council which constitute a two tier "may issue" registration and licensing regime and which delegate to the Chief unfettered discretion to issue regulations to make and to implement the District's gun policies.

111.   The statutes enacted by the D.C. Council grant/ deny/ suspend/ revoke registration certificates and CPLs and to dispossess law-abiding people who are entitled to register guns and to hold CPLs.

112.   Before Mr. Hardwick's arrest the Chief exercised his discretion to formulate a policy and protocol for handling what he considers "negligent storage violations."

113.    When MPD officers encounter a "negligent storage violation" in the field MPD seize the handgun, apply for a warrant for a negligent storage charge, forward the paperwork to the Firearms Registration Branch, and released the person without giving them a citation or notice to return to court.

114.    The Firearms Registration Branch usually issues the licensee a notice of proposed revocation of their registration certificate and their concealed pistol license based on the alleged violation. However, Firearms Registration Branch plans that the revocation proceedings will usually be resolved with an agreement that the individual's registration certificate and license will be suspended for a matter of months, rather than revoked.

115.    Violations of criminal rules are not usually criminally prosecuted.

116.    Frequently the Chief and the MPD charge or seek a warrant for a negligent storage charge for which probable cause is lacking such as negligent storage around a child in Mr. Hardwick's case or a repealed regulation such as 24 DCMR 2304.9 (repealed in 2009) in Timothy Beck's case (Chief's revocation of CPL reversed in October 2024 by District of Columbia Office of Administrative Hearings (OAH) because based on regulation repealed in 2009).

117.     Finally, the Chief retains possession of the handgun for a period determined by the Chief in their own discretion.

118.    The Chief knows that because no criminal prosecution is ever filed the owner of the handgun will not have access to Superior Court Rule 41(g) or any other retrieval procedure to file a motion for return of property in a court.

**The District's procedure for return of property seized by the MPD for investigation or as evidence is not reliably available to claimants unless or until a prosecutor initiates a prosecution relating to the property in Superior Court.**

119.    The MPD seized Mr. Hardrick's property and classified it as "evidence" for use in a criminal investigations and prosecution without providing him notice and a hearing pursuant to a policy of not providing process to people like Mr. Hardrick whose property was taken by MPD but who were never prosecuted either because their charges were "no-papered" (prosecutor rejected charges) or for some other reason.

120.    The District does not provide notice and a hearing to people like Mr. Hardrick whose charges were no-papered because Superior Court Rule 41(g) governing motions for return of property does not apply (at least not reliably) where no criminal case relating to the property has ever been instituted by the relevant prosecutor in the Superior Court.

121.    There is a gap in coverage in Superior Court Criminal Rule 41(g): as a matter of law Rule 41(g) is not reliably available to owners of property seized by the MPD unless and until the District's prosecutor brings a criminal prosecution relating to the property in Superior Court,. *Sharif Abdus-Shakur v. United States*, 2020 CNCSLD 000303, Order issued by the then Presiding Judge of Criminal Division denying Rule 41(g) motion for return of property, at 1 (Criminal Division of the Superior Court has no jurisdiction or authority under Rule 41(g) over property seized without a warrant in connection with a criminal investigation before a criminal prosecution relating to the property is instituted by a prosecutor in Superior Court)(decided 2020), and no case is ever instituted in Superior Court for people like Mr. Hardrick whose charges are no-papered or otherwise never result in a prosecution.

122.    Mr. Hardrick's case falls squarely in the gap.

123. The Government of the District of Columbia has known for years about the gap because the District enacted Rule 41(g), it has had actual and constructive knowledge for years about the gap from the text of Rule 41(g) and cases decided by Superior Court and District of Columbia Court of Appeals Judges and District Court judges, and papers filed in those cases, and it has had actual and constructive knowledge for years that MPD routinely seizes and retains property including guns where no criminal prosecution relating to the property is ever instituted in Superior Court by a prosecutor pursuant to written policy statements promulgated by the Chief.

124. At the time Mr. Hardwick's handgun was held by the Chief the Superior Court Clerk would not accept for filing motions for return of property unless a Superior Court prosecution related to the property was pending.

125. *Sharif Abdus-Shakur v. United States*, 2020 CNCSLD 000303 was filed with the duty judge to circumvent the Superior Court's ban on accepting motions for return of property unless a Superior Court prosecution related to the property was pending, but the Presiding Judge of the Criminal Division dismissed the motion for lack of jurisdiction.

126. The cases on the chart show the District knew or must have known about the gap:

| Date of seizure by MPD | Item of property seized by MPD | Length of seizure | Status of arrest | Case citation |
|---|---|---|---|---|
| September 6, 2014 | van | Many months | No charge | *Avila v. Dailey*, 246 F. Supp. 3d 347, 362-363 (D.D.C. 2017) |
| June 22, 2020 | MPD seizes one backpack which contained his phone, his money for rent, the key to his storage locker, and his clothing | destroyed | No charge | *Coley v. Bowser*, 2021 U.S. Dist. LEXIS 77337 (D.D.C. 2021) |

| 2020 | van | weeks | No charge | *Sharif Abdus-Shakur v. United States*, 2020 CNCSLD 000303 |
|---|---|---|---|---|
| August 13, 2020 | 40 Smartphones from 40 people | 285 and 312 days after seizure | No-papered | *Cameron v. District of Columbia,* 2022 U.S. Dist. LEXIS 154589 (D.D.C. 2022) |
| between 2018 and 2021 | 208 instances of unreasonably protracted seizures of smartphones (and in one case, an iPad) | Not known exactly – protracted seizures | | described in *Cameron* complaint and *Parrott* complaints |
| August 31, 2020 protest | Cell phone camera | 11 months, till August 3, 2021 | No charge | *Asinor v. Dist. of Columbia,* 2022 U.S. Dist. LEXIS 154588, *2 (D.D.C. 2022) |
| August 22, 2019 | Volkswagen Passat | Two years | No charges filed for months | *Parrott v. District of Columbia*, 2023 U.S. Dist. LEXIS 29856, *4-5 (D.D.C. 2023) |
| early May 2020 | Truck | About a year | No charges | |
| October 18, 2021 | Infinity car | Seven months | No charges | |
| July 23, 2021 | Car | Months | No charges | |
| August 2021 | $67,677 in cash | Over two years | No charges | *West v. D.C.,* 2023 U.S. Dist. LEXIS 160759, *8 (D.D.C. 2023) |

127.    The MPD implemented a comprehensive system of seizing property for use in criminal investigations and prosecutions pursuant to a written policy directive entered by the Chief. General Order 601.01.

128.    Every day pursuant to written policy statements promulgated by the Chief the District seizes hundreds of items of property for use in investigations (and as part of its gun control regime) even before an arrest of a suspect or institution of a criminal prosecution in Superior Court and also incident to arrest of a suspect in warrantless arrests where the prosecutor never institutes a criminal prosecution in Superior Court relating to the property.

129.    The District seizes 20 or 30 guns a week for violations of the District's laws or to remove guns from people.

130.    The District has for many years operated a Gun Control Unit composed of over 20 officers dedicated to seizing handguns from people who do not have registration certificates or CPLs issued by the District's Chief of Police (the issuing authority) and from people whom the Chief in their unfettered discretion believe should not have handguns in the District.

131.    Because the District borders two other jurisdictions – Virginia and Maryland – which have relatively lenient gun laws, many people from out of state bring their guns from their home states where they are legal into the District where they are illegal, and they get arrested, and the MPD seize their guns incident to arrest or simply seizes their handguns without prosecutions.

132.    In a recently settled class action challenging the District's policies of arresting people pursuant to its unconstitutional gun control regime, the data showed that about 4,000 people were arrested for violations of the District's gun laws during the class period (2012 to July 2014).

*Smith v. Gov. of the D.C.*, 15-737 (RCL). About 1,800 of those arrests were no-papered, or the prosecutor rejected the arrests for prosecution, meaning no criminal prosecution was ever instituted in Superior Court relating to the seized handgun.

133.    Given the District's continuing vigorous enforcement of its restrictive "may-issue" gun control regime, the numbers of people arrested for illegal possession of handguns, the number of guns seized without prosecutions instituted in Superior Court remains the same every year.

134.    The District seizes many guns each year in connection with which no criminal prosecution is ever instituted in Superior Court because the prosecutor "no papers" the case.

135.    An analysis of data released by the DC Sentencing Commission in 2025 shows the following: In 2023 the USAO outright declined to prosecute 33% of arrests for felony gun possession. In 2018 the USAO prosecuted 85% of CPWL cases while in 2023 they only charged 68% of CPWL cases. This was at least up from a record-low 53% prosecution rate of CPWL cases in 2022.[3]

---

[3] https://dccrimefacts.substack.com/p/the-us-attorneys-hidden-role-in-undermining

136.    A chart prepared by DC Crime Facts blog shows the USAO no-paper rate for MPD's CPWL and UPF rates: [4]



137.    Moreover, as Ms. Campbell explained to Mr. Hardwick in December 2022, the Chief was following a policy of not releasing seized handguns back to owners at the time the Chief refused to release his gun.

138.    The existence of a protocol for handling seizures of handguns for negligent storage of handguns by CPL holders establishes the existence of a municipal policy at least in the form of a custom or a practice of seizing and holding such guns without prosecutions ever being filed in Superior Court.

139.    The MPD seized two other handguns for alleged negligent storage violations and retained the handguns for some time belonging to Leon Williams on September 23, 2023, and Eric Christian on January 16, 2024.

---

[4] https://www.slowboring.com/p/why-most-gun-arrests-in-dc-dont-lead

140. No criminal prosecution was ever instituted against Mr. Christian, yet the MPD held his gun for months.

141. The District in a public filing in *Parrott* stated that in its initial data collection in connection which the case, MPD identified more than 14,000 vehicles and cell phones seized as evidence during the time period applicable to Plaintiffs' request, basically from 2018 to the date of the filing, December 12, 2023.

142. An analysis of publicly available data on the Superior Court docket on the District Court's website indicates that no criminal prosecution connected with the property was ever instituted in Superior Court for the many of the vehicles and cell phones.

**The MPD does not provide notice in connection with seized property the MPD classifies as "evidence"**

143. The MPD does not provide notice, or an inventory of property seized at or promptly after seizure for property which the MPD classifies "as evidence."

144. No statute, rule, regulation, or Court order provides for written notice and an inventory of property which the MPD classifies as "evidence" seized without a warrant.

145. Instead, the MPD sits back and waits for owners to track down their property including handguns at the local MPD station and then beg police for the return of their property such as vehicles and smartphones and guns.

**CLAIMS FOR RELIEF**

**CLAIM 1**

**Second Amendment claim**

146.   Mr. Hardrick adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

147.   The District and its Chief and officers violated Mr. Hardrick's Second Amendment right to carry a handgun in public for self-defense.

148.   The District and the Chief's unconstitutional conduct described above was the moving force of his injuries including the loss of his gun and defending against unconstitutional revocation proceedings and the revocation of his registration certificate and his CPL.

149.   Mr. Hardwick suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being disposed of his handgun and his Second Amendment rights because of the City's enactment and enforcement of its unconstitutional gun control regime which gave the Chief unfettered discretion to grant or deny registration certificates and CPLs and to revoke registration certificates and CPLs.

150.   Mr. Hardwick is therefore entitled to monetary compensation and the other relief described herein.

151.   Mr. Hardwick suffered emotional distress and felt unsecure without his handgun.

152.   Mr. Hardwick incurred legal fees and loss of personal time in obtaining the return of his handgun.

153.   The District and the Chief's unconstitutional conduct described above was the moving force of his injuries including the loss of his gun and defending against unconstitutional revocation proceedings and the revocation of his registration certificate and his CPL.

154.   Accordingly, Mr. Hardrick is entitled to relief as set forth herein.

## CLAIM 2

**Fifth Amendment due process claim**

155.    Mr. Hardrick adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

156.    The District seized Mr. Hardwick's handgun for use in a criminal investigation or prosecution without providing the process required by the Due Process Clause: (1) a prompt post deprivation hearing and (2) timely notice of how to invoke a prompt post deprivation hearing.

157.    The MPD seized Mr. Hardrick's property as "evidence" for use in a criminal investigations and prosecution without providing him notice and a hearing pursuant to a policy of not providing process to people like Mr. Hardrick whose property was taken by MPD but who were never prosecuted either because their charges were "no-papered" (prosecutor rejected charges) or for some other reason.

158.    The District does not provide notice and a hearing to people like Mr. Hardrick whose charges were no-papered because Superior Court Rule 41(g) governing motions for return of property does not apply (at least not reliably) where no criminal case relating to the property has ever been instituted by the relevant prosecutor in the Superior Court.

159.    There is a gap in coverage in Superior Court Criminal Rule 41(g): as a matter of law Rule 41(g) is not reliably available to owners of property seized by the MPD unless and until the District's prosecutor brings a criminal prosecution relating to the property in Superior Court,. *Sharif Abdus-Shakur v. United States*, 2020 CNCSLD 000303, Order issued by the then Presiding Judge of Criminal Division denying Rule 41(g) motion for return of property, at 1 (Criminal Division of the Superior Court has no jurisdiction or authority under Rule 41(g) over property seized without a warrant in connection with a criminal investigation before a criminal

prosecution relating to the property is instituted by a prosecutor in Superior Court)(decided 2020), and no case is ever instituted in Superior Court for people like Mr. Hardrick whose charges are no-papered or otherwise never result in a prosecution.

160.    Mr. Hardrick's case falls squarely in the gap.

161.    The District has no regular procedures for the prompt return of the property after the government no longer needs it. The owner or their representative must bounce back and forth between the MPD and the prosecutor looking for a PD 81-C (MPD release form prosecutor must sign before the MPD will release property the MPD has classified as "evidence."

162.    The District should have provided notice explaining how to invoke prompt post deprivation hearings and should have provided prompt post deprivation hearing to Mr. Hardrick and others on how to retrieve their property including his handgun, but it failed to do so.

163.    The District should have provided a prompt post deprivation hearing to Mr. Hardrick on how to challenge the MPD's classification of the handgun as "evidence," or how to challenge the Chief's refusal to release handguns for any other reason, or how to get his handgun back when the District no longer needed it, or how to get the handgun back conditionally, or how to get a PD 81-C and a procedure for doing so, but it did not.

164.    The Superior Court Clerk's Office did not accept motions for return of property based on Rule 41(g) until after Mr. Hardwick obtained the return of his handgun. Any such procedure is secret and information about it is not available from public sources such as statutes or court decisions (which are filed under seal).

165.    The District and the Chief's unconstitutional conduct described above was the moving force of his injuries including the loss of his gun and defending against unconstitutional revocation proceedings and the revocation of his registration certificate and his CPL.

166.    Mr. Hardwick is therefore entitled to monetary compensation and the other relief described herein.

167.    Mr. Hardwick suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being disposed of his handgun and his Second Amendment rights because of the City's enactment and enforcement of its unconstitutional gun control regime which gave the Chief unfettered discretion to grant or deny registration certificates and CPLs and to revoke registration certificates and CPLs.

168.    Mr. Hardwick suffered emotional distress and felt unsecure without his handgun.

169.    Mr. Hardwick incurred legal fees and loss of personal time in obtaining the return of his handgun.

170.    The District and the Chief's unconstitutional conduct described above was the moving force of his injuries including the loss of his gun and defending against unconstitutional revocation proceedings and the revocation of his registration certificate and his CPL.

**Municipal Policy- Baker # 1.**

171.    The District as a policy decision enacted and adopted a practice of seizing property for use in investigations and prosecutions but as a policy choice selected from options it did not provide prompt post deprivation hearings and notice of how to invoke such hearings for owners like Mr. Hardwick unless and until a prosecution was enacted in Superior Court.

172.    The District's policy was the moving force behind Mr. Hardwick's injuries.

**Policymaker - Baker # 2.**

173.    The Chief as a policy maker for the District adopted a policy decision and adopted a practice of seizing property for use in investigations and prosecutions as a policy choice selected from options but he knew there was no prompt post detention hearings for property seized before a related case is instituted in Superior Court, nor did he provide prompt post deprivation hearings and notice of how to invoke such hearings for owners like Mr. Hardwick unless and until a prosecution was enacted in Superior Court.

174.    The Chief's policy was the moving force behind Mr. Hardwick's injuries.

**Failure to enact policy – Baker # 3.**

175.    The District and the Chief as policy maker for the District on property and gun control issues adopted a system of managing property coming into the custody of the MPD including seizing and classifying property for use in investigations and criminal prosecutions, MPD General Order 601.1, Recording, Handling and Disposition of Property Coming into the Custody of the Department, but they failed to enact prompt post deprivation hearings and they failed to provide for notice of how to invoke prompt post deprivation hearings for owners of property like Mr. Hardwick unless and until a prosecution was enacted in Superior Court. https://go.mpdconline.com/GO/GO_601_01.pdf

176.    The District's and the Chief's policy of failing to enact prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings and its and the Chief's custom of seizing property (including handguns) without in many cases instituting criminal prosecutions in Superior Court was the moving force behind Mr. Hardwick's injuries.

**Deliberate indifference – Baker # 4.**

177.    The District and the Chief had a custom and policy of seizing property and handguns for use in investigations and criminal prosecutions and as part of its gun control regime without providing prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings during the relevant period.

178.    The District and its policymakers such as the Chief knew that the MPD was seizing property and handguns for use in investigations and criminal prosecutions and as part of its gun control regime without providing prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings during the relevant period actually and constructively.

179.    The District and its policymakers knew that Constitutional violations would and did occur from such conduct actually and constructively and because it was obvious that such deprivations would occur.

180.    The District and its policymakers were thus deliberately indifferent to the rights of such property owners including the owners of handguns like Mr. Hardwick.

181.    The District and its policy makers' deliberate indifference was the moving force behind Mr. Hardwick's injuries.

182.    Accordingly, Mr. Hardrick is entitled to relief as set forth below.

## CLAIM 3

### Fifth Amendment Takings claim

183.    Mr. Hardrick adopts by reference the contents of the preceding paragraphs as if fully set forth herein.

184.    Mr. Hardrick violated no law justifying the seizure and retention of his handgun for more than a few days.

185.    Thus, there was no police powers need for the District to seize and retain his handgun and no reason the retain it after it was taken.

186.    The continued retention of Mr. Hardwick's handgun after any police powers need for it violated the Fifth Amendment Takings clause.

187.    The District and the Chief's unconstitutional conduct described above was the moving force of his injuries including the loss of his gun and defending against unconstitutional revocation proceedings and the revocation of his registration certificate and his CPL.

**Direct Fifth Amendment Takings claim.**

188.    The Takings Clause contains a direct cause of action against local governments so a direct Takings Claim lies against the District without the need for § 1983 and its policy requirements.

**Municipal Policy- Baker # 1.**

189.    The District as a policy decision enacted and adopted a practice of seizing property for use in investigations and prosecutions but as a policy choice selected from options it did not provide prompt post deprivation hearings and notice of how to invoke such hearings for persons like Mr. Hardwick unless and until a prosecution was enacted in Superior Court.

190.    The District's policy was the moving force behind Mr. Hardwick's injuries.

191.    **Policymaker - Baker # 2.**

192.    The Chief as a policy decision enacted and adopted a practice of seizing property for use in investigations and prosecutions but as a policy choice selected from options, he knew or should have known did not provide prompt post deprivation hearings and notice of how to

invoke such hearings for persons like Mr. Hardwick unless and until a prosecution was instituted in Superior Court.

193. The Chief's policy was the moving force behind Mr. Hardwick's injuries.

**Failure to enact policy – Baker # 3.**

194. The District and the Chief as policy maker for the District on gun control issues failed to enact prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings for persons like Mr. Hardwick unless and until a prosecution was enacted in Superior Court.

195. The District's and the Chief's policy of failing to enact prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings and its and the Chief's custom of seizing property (including handguns) without in many cases instituting criminal prosecutions in Superior Court was the moving force behind Mr. Hardwick's injuries.

196. The District's policy was the moving force behind Mr. Hardwick's injuries.

**Deliberate indifference – Baker # 4.**

197. The District and the Chief had a custom and policy of seizing property and handguns for use in investigations and criminal prosecutions and as part of its gun control regime without providing prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings during the relevant period.

198. The District and its policymakers knew that the MPD was seizing property and handguns for use in investigations and criminal prosecutions and as part of its gun control regime without providing prompt post deprivation hearings and notice of how to invoke prompt post deprivation hearings during the relevant period actually and constructively.

199.    The District and its policymakers knew that Constitutional violations would and did occur from such conduct actually and because it was obvious that such deprivations would occur.

200.    The District and its policymakers were thus deliberately indifferent to the rights of such property owners including the owners of handguns like Mr. Hardwick.

201.    The District and its policy makers' deliberate indifference was the moving force behind Mr. Hardwick's injuries.

202.    Accordingly, Mr. Hardrick is entitled to relief as set forth below.

Relief Requested

Mr. Hardrick herein respectfully request that this Court grant the following relief:

**A.**          Enter judgment in his favor on all his claims;

**B.**          Compensatory damages allowed by law;

**C.**          Declare the failure to provide regular procedures for the prompt return of the property after the government no longer needs it, notice and a prompt post deprivation hearing for the return or conditional return of his property in violation of the Second Amendment and/ or the Fifth Amendment;

**D.**          Award Mr. Hardrick nominal damages in connection with any declaration by this Court that the procedures or lack of complained of herein are unconstitutional;

**E.**          Grant a jury trial on all claims so triable;

**F.**          Award Mr. Hardrick injunctive or equitable relief in the form of an order declaring any "arrest" referred to in Firearms Registration Branch documents including emails and any "charges" referred to in the notice of revocation with respect to Mr. Hardwick a legal nullity;

**G.**          Award plaintiff attorney's fees and costs incurred in bringing this action under

42 U.S.C. § 1988; and

**H.**          Grant such other relief as this Court deems just and proper.

Respectfully submitted,


/s/ William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579

Counsel for Plaintiff Mr. Hardrick

717 D Street, N.W
Suite 300
Washington, DC 20004
Phone 202/824-0700
Email claibornelaw@gmail.com

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
Counsel for Plaintiff